## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| North American Butterfly Association, a nonprofit organization located at 4 Delaware Road, Morristown, NJ 07960,<br><br>   Plaintiff,<br><br> -against-<br><br>Kirstjen M. Nielsen, *in her official capacity* as Secretary, United States Department of Homeland Security, residing at 245 Murray Lane SW, Washington D.C. 20528-0075; Kevin M. McAleenan, *in his official capacity* as Acting Commissioner, United States Customs and Border Protection, residing at 1300 Pennsylvania Avenue NW, Washington D.C. 20229; Carla L. Provost, *in her official capacity* as Acting Chief, United States Border Patrol, residing at 1300 Pennsylvania Avenue NW, Washington D.C. 20229; and Manuel Padilla, Jr., *in his official capacity* as Chief Patrol Agent, United States Customs & Border Protection Rio Grande Valley Border Patrol Sector, residing at 4400 South Expressway 281, Edinburg, Texas 78542,<br><br>   Defendants. | No. 1:17-cv-2651 (RJL)<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

  The North American Butterfly Association ("NABA"), a nonprofit organization whose mission is to conserve butterflies and their habitats, for its complaint seeking declaratory and injunctive relief against defendants based on their failure to comply with the requirements of the Constitution and laws of the United States in relation to its border wall preparation activities and law enforcement operations at NABA's National Butterfly Center (the "Butterfly Center") in South Texas, alleges as follows through its undersigned attorneys:

## **PRELIMINARY STATEMENT**

1.  The United States Department of Homeland Security ("DHS"), United States Customs and Border Protection ("CBP"), the United States Border Patrol, and CBP Rio Grande Valley Border Patrol Sector ("RGV Border Patrol" and, together, the "Agencies") have failed to comply with the requirements of the Constitution and laws of the United States in relation to their border wall preparation activities and law enforcement operations at NABA's Butterfly Center.

2.  Through their actions at the Butterfly Center, the Agencies have flouted the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq* and the United States Constitution. They threaten to take NABA's property without just compensation and in violation of NABA's rights to due process, including NABA's statutory rights to negotiation and consultation.

3.  The Agencies and their agents and contractors have entered, damaged and destroyed NABA's private property without authorization or permission. The Agencies admit that their destructive conduct is not toward the end of patrolling the border. Instead, on information and belief, the Agencies' and contractors' activities are in preparation for the construction of a border wall which has been designated to run through the Butterfly Center.

4.  The proposed border wall would deprive NABA of access to no less than two-thirds of the Butterfly Center property.

5.  The Agencies' and contractors' activities (hereinafter "border wall construction") are federal actions that will impact the environment as well as several threatened and endangered species and are thus subject to the procedural and substantive requirements of NEPA and the ESA, respectively.

6. The Agencies have not provided NABA or the general public with notice or opportunity to comment under NEPA for the border wall construction. Indeed, the Agencies have not prepared any NEPA or ESA analysis for the construction.

7. Border wall construction additionally unconstitutionally and unlawfully interferes with NABA's use and enjoyment of its property.

8. The Agencies have not taken any steps to secure permission for their conduct or mitigate the harm they have caused and, upon information and belief, will continue to cause.

9. Although neither NEPA nor the United States Constitution requires a plaintiff to provide federal agencies with notice of alleged violations prior to filing suit, on October 4, 2017, NABA wrote the Agencies to provide notice of NEPA violations, unconstitutional and otherwise unlawful interference with property and consistent and constitutionally prohibited harassment of NABA employees and Butterfly Center visitors. The Agencies have not acknowledged or responded to this notice.

10. Also on October 4, 2017, NABA provided the Agencies with formal notice of violations of the ESA for their failure to consult with the United States Fish and Wildlife Service ("FWS") in order to ensure that border wall construction does not jeopardize the continued existence of threatened or endangered species or result in the destruction or adverse modification of their critical habitats. On January 26, 2018, NABA forwarded the letter to United States Department of the Interior Secretary Ryan Zinke pursuant to 16 U.S.C. § 1540(g)(2). The Agencies have failed to remedy the alleged ESA violations, including in the 60 days after notice was forwarded to Secretary Zinke.

11. The Agencies have provided no justification or excuse for their failure to comply with NEPA or the ESA.

1003565181v7

12.     The Agencies and their contractors have ignored and otherwise violated applicable constitutional and statutory requirements.

## JURISDICTION

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701 – 706.  The claims for relief arise under the laws of the United States, including NEPA, the ESA, the Administrative Procedure Act, 5 U.S.C. § 552, the implementing regulations established pursuant to these federal statutes, and the United States Constitution.  The relief requested is authorized pursuant to 28 U.S.C. §§ 1651 and 2201 – 2202, and 5 U.S.C. §§ 705 and 706.

## VENUE

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e), because a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by the Agencies, and/or failures to act by the Agencies, and because, as an action against employees of the United States acting in their official capacity, this action may be brought in any district in which a defendant resides.

## PARTIES

15.     NABA is incorporated as a nonprofit under the laws of the State of New York and Section 501(c)(3) of the Internal Revenue Code.  It is headquartered in Morristown, New Jersey, and its mission is to conserve butterflies and their habitats.  NABA owns and operates the Butterfly Center, its 100-acre flagship facility in South Texas.  The Butterfly Center abuts the Rio Grande and is a part of the FWS's Lower Rio Grande Valley Wildlife Corridor.  Proposed border wall construction would cut off two-thirds of the Butterfly Center, effectively destroying

1003565181v7

it and leaving behind a 70-acre no-man's land between the proposed border wall and the Rio Grande.

16. Defendant Kirstjen M. Nielsen, DHS Secretary, is sued in her official capacity. DHS is responsible for ensuring border security along the United States-Mexico border. Secretary Nielsen is the official ultimately responsible under federal law for ensuring that the actions and management decisions of DHS comply with all applicable laws and regulations.

17. Defendant Kevin K. McAleenan, Acting Commissioner of CBP, is sued in his official capacity. CBP is responsible for ensuring border security along the United States-Mexico border. Acting Commissioner McAleenan is the official ultimately responsible under federal law for ensuring that the actions and management decisions of CBP comply with all applicable laws and regulations.

18. Defendant Carla Provost, Acting Chief of the United States Border Patrol, is sued in her official capacity. Chief Provost is the official ultimately responsible under federal law for ensuring that the actions and management decisions of United States Border Patrol comply with all applicable laws and regulations.

19. Defendant Manuel Padilla, Jr., Chief Patrol Agent for the RGV Border Patrol, is sued in his official capacity. RGV Border Patrol is one of nine CBP Border Patrol Sectors located along the southwest border of the United States. The RGV Border Patrol is responsible for ensuring border security along a 17,000 square-mile area. This area includes the Butterfly Center. Chief Padilla is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the RGV Border Patrol comply with all applicable laws and regulations.

1003565181v7

## **LEGAL BACKGROUND**

**A.  NEPA**

20. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2017).  It contains several "action-forcing" procedures, including the mandate to prepare an environmental impact statement ("EIS") on major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C) (2017).

21. An EIS must include, "to the fullest extent possible," a "detailed statement" on

> (i)  the environmental impact of the proposed action,
> (ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii)  alternatives to the proposed action,
> (iv)  the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v)  any irreversible or irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 17 (D.D.C. 1999).

22. NEPA requires that "[a]gencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2 (2017).

23. DHS has issued an Instruction Manual regarding the implementation of NEPA. Instruction Manual 023-01-001-01, Revision 01, Implementation of NEPA (Nov. 6, 2014).  The Manual states that "proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas" "normally require[es]" the preparation of an EIS.  DHS NEPA Manual, at p.V-9.  This preparation must occur "at the earliest possible

stage so that environmental factors are considered with sufficient time to have a practical influence on the decision-making process before decisions are made." DHS NEPA Manual, at p. IV-1.  Agency components making funding determinations "have a responsibility to integrate NEPA requirements early in the application process," and to ensure that "completion of the NEPA process occurs before making a decision to approve." DHS NEPA Manual, at p. VII-1.

24. NEPA requires that the Agencies involve the public in preparing and considering environmental documents that implement the Act.  40 C.F.R. § 1506.6(b) (2017).

25. The CEQ regulations further direct federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made," and state that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R.§ 1500.1(b) (2017).

26. The Supreme Court has stated that the preparation of an EIS promotes NEPA's broad environmental objectives in key regards.  Preparing an EIS ensures that the agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 349.  "[P]erhaps more significantly," the preparation of an environmental impact statement "provides a springboard for public comment," so studies reflect the work not only of the agencies themselves, but also "the critical views" of stakeholders. *Id.* at 349-350.  Where, as here, potential adverse impacts on air quality, waters, an international boundary, and fauna will be subject to regulation by other governmental bodies, the EIS "serves the function of offering those bodies adequate notice of the expected consequences and the opportunity to plan and implement corrective measures in a timely manner." *Id.* at 350.

27. The unjustified failure to prepare an EIS renders agency action "arbitrary and capricious." *Edmonds Inst.*, 42 F. Supp. 2d at 18.

### B. Endangered Species Act

28.     The ESA, 16 U.S.C. § 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b) (2017).

29.     To achieve these objectives, the ESA directs the Secretary of the Interior, through the FWS, to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species. 16 U.S.C. § 1533(a)(1) (2017).

30.     Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery, including the designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species and the requirement for interagency consultation. *Id.* § 1533(a)(3)(A)(i); *id.* § 1533(f); *id.* § 1536.

31.     Every federal agency is required by the ESA to ensure, in consultation with the FWS, "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2) (2017).

32.     In furtherance of the substantive mandate to avoid jeopardizing listed species or adversely modifying designated critical habitat, agencies are required to engage in a cooperative analysis of potential impacts to listed species and their habitats known as the consultation process. *Id.*

1003565181v7

33.     Through the formal Section 7 consultation process, FWS prepares a "biological opinion" as to whether the action is likely to jeopardize the species or destroy or adversely modify critical habitat and, if so, suggests "reasonable and prudent alternatives" to avoid the result.  16 U.S.C. § 1536(b)(3)(A).

### C. Deprivation of Property without Due Process

34.     The United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  U.S. CONST. amend. V.

35.     Any deprivation of property must honor this constitutional guarantee.  Due process is defined in part by the myriad statutory limitations on the government's power to take property for border wall construction.  *See* 40 U.S.C. § 3114, *et seq.*

36.     Deprivation of property for border wall construction additionally requires negotiation with landowners and consultation with stakeholders and the public.

37.     In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which amended portions of the Immigrant and Nationality Act, codified and amended at 8 U.S.C. § 1103.  Congress afforded a limited power to the Attorney General to acquire land for purposes of building a border fence.  The pertinent statute provided that:

> (1)     The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this act.

1003565181v7

>    (2)   The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.
>
>    (3)   When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

8 U.S.C. § 1103(b).

38.  The 2008 Appropriations Act, Pub. L. 110-161, December 206, 2007, 121 Stat. 1844 (2007), added additional limitations. The Appropriations Act added a "consultation provision" to the note to 8 U.S.C. § 1103. That provision contains mandatory language requiring the Secretary of Homeland Security to consult with property owners and local governments to inform considerations of the environmental, cultural, commercial and communal impacts of border wall construction. *United States v. 1.04 Acres of Land, More or Less, Situated in Cameron Cty.*, 538 F. Supp. 2d 995, 1014 (S.D. Tex. 2008).

39.  The deprivation of property can occur even when the government does not appropriate the entire plot of privately owned land. For example, a taking may be regulatory in nature, whereby government action deprives a landowner of all beneficial use of their property without actually appropriating it. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1017 (1992).

10

**D. Unlawful Incursion into Private Property**

40. The Constitution additionally provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.

41. "[W]ithin a distance of twenty-five miles" from an external boundary, federal law grants CBP "officer[s] or employee[s]," 8 U.S.C. § 1357(a), the limited power to "have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Id.* § 1357(a)(3).

42. Nothing in this provision grants access to private lands to individuals other than officers or employees of CBP.

43. Nothing in this provision grants access to private lands for purposes other than patrolling the border.

44. Nothing in this provision grants a right to control the movement of persons lawfully on the property.

45. Nothing in this provision grants a right to modify or destroy the property.

**FACTUAL BACKGROUND**

46. The Butterfly Center is a 100-acre wildlife center and native species botanical garden. It encompasses trails for exploration, observation and conservation areas, educational exhibits and a plant nursery. The Butterfly Center is the premier place in the United States to see and learn about wild butterflies. It is visited by tens of thousands of people each year, including thousands of local schoolchildren. On a given day, one can see 100 species of wild butterflies

and as many as 200,000 individual butterflies, none of which is held in captivity at the Butterfly Center.

47. The Butterfly Center abuts the Rio Grande and is part of the FWS's Lower Rio Grande Valley Wildlife Corridor.

48. The Rio Grande Valley is a major bird migration corridor with over 500 species and is the last remaining habitat in the United States for the endangered ocelot.

49. In addition to being a habitat for the flora and fauna throughout the Rio Grande Valley, the Butterfly Center is home to a number of endangered species. For example, the Butterfly Center partnered with the FWS to create a refugium for the Slender Rushpea (*Hoffmannseggia tenella*),[1] and is creating a five-acre refugium for endangered Tamaulipan Kidneypetal (*Ayenia limitaris*).[2] The Butterfly Center is home to endangered Walker's Manioc (*Manihot walkerae*).[3] It is home to threatened species like Texas Tortoises (*Gopherus berlandieri*),[4] Texas Horned Lizard (*Phrynosoma cornutum*)[5] and Texas Indigo Snakes (*Drymarchon melanurus erebennus*).[6]

50. Additionally, on information and belief, there are a number of federally endangered aquatic species that live in the Mission Main Canal that flows through the Butterfly Center.

51. On January 25, 2017, President Donald J. Trump issued Executive Order No. 13767, entitled "Border Security and Immigration Enforcement Improvements." Exec. Order No. 13767, 82 Fed. Reg. 18 (Jan. 30, 2017). Following a campaign promise to erect a wall

---

[1] The Slender Rushpea was listed as endangered on November 1, 1985. 50 Fed. Reg. 45614 (Nov. 1, 1985).
[2] Texas Ayenia was determined to be endangered on August 24, 1994. 59 Fed. Reg. 43648 (Aug. 24, 1994).
[3] Walker's Manioc was determined to be endangered on October 2, 1991. 56 Fed. Reg. 49850 (Oct. 2, 1991).
[4] Both the federal and Texas governments have determined the tortoise is threatened.
[5] Texas determined the lizards are threatened.
[6] Texas determined the snakes are threatened.

1003565181v7

between the United States and Mexico, the Order directed DHS to construct a "secure, contiguous, and impassable physical barrier" along the entirety of the nearly 2,000 mile-long United States-Mexico border.

52. Subsequently, former DHS Secretary John Kelly issued a memorandum directing CBP to "immediately begin planning, design, construction, and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law."

53. Such "planning, design, construction, and maintenance" of a wall began without warning at the Butterfly Center. On July 20, 2017, Marianna Wright, Executive Director of the Butterfly Center, discovered a work crew on Butterfly Center property. The crew had two pieces of heavy equipment, a Brush Hog and an articulating Brush Boom as well as chainsaws; they were using these to cut down trees, mow brush, and widen a private road that runs on Butterfly Center Property. The crew had cleared up to 18 feet on each side of the road. The road they were extending was already sufficiently wide for two lanes, each fitting a large vehicle. The road is well-maintained by the Butterfly Center, whose employees routinely use the road for Butterfly Center activities.

54. Elsewhere in the property, Ms. Wright discovered surveyor flags, suggesting further destruction was intended.

55. Ms. Wright immediately contacted CBP, which first denied its affiliation with the contractors and then asserted its blanket authority for the invasion. Despite CBP's confidence in the legitimacy of its conduct, it was vague about the bases for its purported authority, citing only unspecified "tactical infrastructure" and promising that additional CBP officials would contact the Butterfly Center to provide clarity.

56. Though such clarity never came, on August 1, 2017, Defendant Padilla and two CBP agents appeared at the Butterfly Center. Defendant Padilla showed Ms. Wright a draft proposal for the border wall, including a segment through the Butterfly Center. The Butterfly Center was to forfeit approximately two-thirds of its area.

57. Defendant Padilla added that additional large areas of the Butterfly Center would be cleared for secondary roads and government operations.

58. Notwithstanding the failure to seek any legal authorization or afford any process to NABA for the deprivation of its property, Defendant Padilla warned that border wall construction would be backed by a "green uniform presence."

59. In addition to entering, modifying and destroying the Butterfly Center without invoking legal authorization or affording any process, Defendant Padilla referred to "sensors" that had been placed throughout the Butterfly Center. Defendant Padilla refused to disclose the locations and types of these permanent incursions into NABA's property.

60. Defendant Padilla also stated that NABA could not gate or lock the Butterfly Center. He threatened that any gates or locks would be cut down.

61. Ms. Wright and others have attempted to negotiate with Defendant Padilla and other CBP officials. CBP has retaliated against Ms. Wright's and others' assertions of NABA's property rights by initiating a campaign of harassment towards Butterfly Center employees and visitors. For example, CBP officials followed and temporarily detained Ms. Wright and a reporter merely for attempting to drive into the Butterfly Center. Despite having familiarity with Ms. Wright and her vehicle, CBP officials executed the detention with a show of force including multiple CBP officers and a helicopter flank.

14

1003565181v7

62. CBP now regularly stations itself on the Butterfly Center property—in contrast to patrolling the Butterfly Center—and officers assert that vast stretches of the property are off limits to Butterfly Center employees and visitors. Officers confront and restrict Butterfly Center employees and visitors despite clear markers of their lawful presence on the property, including employee and volunteer badges and guest wristbands.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NEPA VIOLATIONS

63. Plaintiff incorporates by reference the allegations in all preceding paragraphs.

64. Defendants are required to prepare an environmental impact statement ("EIS") on major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

65. Defendants' activities in the Butterfly Center, including border wall construction, significantly affect the quality of the human environment.

66. Defendants have violated NEPA and NEPA's implementing regulations by beginning border wall construction without first conducting the necessary environmental analysis.

67. Defendants' failure and/or refusal to conduct NEPA analysis is inconsistent with provisions of the DHS NEPA Manual, including provisions requiring preparation of at least an Environmental Assessment when a proposed project may impact important environmental resources and directing that NEPA shall be applied as early as possible in the planning process.

68. Defendants have failed to provide any explanation or reasoning for their failure to conduct any NEPA analysis.

1003565181v7

69. Defendants' failure or refusal to conduct a NEPA analysis has caused the Agencies to overlook a demonstrable risk of serious environmental impacts to NABA's property at the Butterfly Center, and have made it impossible for the Agencies to avoid and/or mitigate these environmental impacts. Such failure is in violation of NEPA.

70. Moreover, Defendants have failed or refused to involve the public in any way in consideration of the environmental impacts of the preparation or construction of the border wall, in violation of 40 C.F.R. § 1506.6 (2017).

71. Border wall construction on the Butterfly Center is arbitrary and capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law. It is subject to judicial review pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702-704.

## SECOND CLAIM FOR RELIEF
## ESA VIOLATIONS

72. Plaintiff incorporates by reference the allegations in all preceding paragraphs.

73. Section 7(a)(2) of the ESA requires that "[e]ach Federal agency shall, in consultation with . . . [FWS], insure that any action authorized, funded, or carried out by such agency . . .is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

74. FWS's regulations define an agency "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (2017).

1003565181v7

75. Border wall construction directly, indirectly and cumulatively impacts numerous species listed as threatened or endangered under the ESA as well as designated critical habitat for those species.

76. Despite the presence of many listed species at the Butterfly Center in particular and of listed species and critical habitat designations in the borderlands region more generally, as well as the documented impacts of DHS border barrier and road construction on many of these species and critical habitats, Defendants have failed to initiate or complete consultations with FWS.  Defendants therefore have failed to insure that border wall construction does not jeopardize the continued existence of any listed species or adversely modify or destroy the designated critical habitat for any of those species, and therefore are in violation of Section 7(a)(2) of the ESA.  16 U.S.C. § 1536(a)(2) (2017).

77. Defendants have also failed to take any affirmative steps to conserve the many threatened or endangered species impacted by the border wall construction in violation of Section 7(a)(1) of the ESA.  16 U.S.C. § 1536(a)(1) (2017).

78. Notice of these violations was provided to the Agencies on October 4, 2017.  On January 26, 2018, notice of these violations was provided to the Secretary of the Interior.  As such, the notice prerequisite to asserting violations of the ESA has been satisfied.

**THIRD CLAIM FOR RELIEF**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW**

79. Plaintiff incorporates by reference the allegations in all preceding paragraphs.

80. Defendants have occupied and/or instructed their agents to occupy NABA's property without authorization.

17

81. Defendants have damaged and destroyed and/or instructed their agents to damage and destroy NABA's property without authorization.

82. Defendants have indicated that they will continue to occupy and cause damage to NABA's property. Proposed border wall construction will take at least two-thirds of the Butterfly Center and render the remainder unsuitable for NABA's intended use without value.

83. Defendants have cited no lawful basis for their intrusion and destruction of NABA property. Defendants have not sought to acquire an interest in NABA property or followed any of the steps for doing so, including, *inter alia*, engaging in negotiations with NABA, contrary to the provisions of 8 U.S.C. § 1103(b).

## FOURTH CLAIM FOR RELIEF
## UNLAWFUL INCURSION INTO PRIVATE PROPERTY

84. Plaintiff incorporates by reference the allegations in all preceding paragraphs.

85. Defendants have entered and/or instructed their agents to enter NABA's property without authorization, consent or a judicial warrant, in violation of the Fourth Amendment.

86. Defendants, including Defendant Padilla, have indicated that they will continue to enter NABA's property without regard to NABA's ownership thereof, notwithstanding any of NABA's efforts to secure their property.

87. Defendants have admitted to placing sensors throughout NABA's private property, constituting a permanent intrusion on NABA's use and enjoyment of the Butterfly Center.

88. Defendants have additionally deprived Butterfly Center employees and visitors from lawful access to large stretches of NABA property.

89. Defendants have cited no lawful basis for this occupation and deprivation.

1003565181v7

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, North American Butterfly Association, prays that this Court:

1. Declare that Defendants have violated NEPA and its implementing regulations with respect to border wall construction by, *inter alia*, failing to conduct any NEPA analysis, failing to provide any opportunity for public participation and failing to scrutinize the potential environmental impacts of the border wall preparation and construction.

2. Declare that Defendants violated the ESA by failing to initiate or complete ESA Section 7(a)(2) consultation with FWS in order to ensure border wall construction does not jeopardize the continued existence of any listed species or adversely modify or destroy the designated critical habitat for those species.

3. Declare that Defendants violated the ESA by failing to take any affirmative action to conserve threatened or endangered species impacted by border wall construction, in violation of Section 7(a)(1) of the ESA.

4. Declare that Border Patrol and CBP agents are only allowed to enter private lands within 25 miles of the border, including but not limited to NABA property at the Butterfly Center, for purposes of patrolling the border, unless they have the consent of the owner.

5. Declare that third-party contractors of Border Patrol and/or DHS are not allowed to enter private lands within 25 miles of the border, including but not limited to NABA property at the Butterfly Center, without the consent of the owner.

6. Enjoin Defendants from border wall construction on NABA's property, unless and until Defendants comply with NEPA, the ESA and the implementing regulations for those laws.

1003565181v7

7. Declare that Defendants have violated the due process guarantee of the Fifth Amendment to the United States Constitution.

8. Issue injunctive relief requiring that Defendants and their agents, employees and successors in office comply with the IIRIRA as amended, the takings clause of the Fifth Amendment and the due process guarantee of the Fifth Amendment before conducting any further activities at the Butterfly Center.

9. Retain jurisdiction in this action to ensure compliance with the Court's Orders.

10. Award Plaintiff its reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (2017) and/or other authority; and

11. Grant such other and further relief to Plaintiff as the Court may deem just and proper.

Dated: New York, New York
March 28, 2018

DEBEVOISE & PLIMPTON LLP

Of Counsel:

Harry Zirlin
David Donatti

By: *s/Timothy K. Beeken*
Timothy K. Beeken (N.Y. Bar No. 2492650)
(tkbeeken@debevoise.com)

919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Plaintiff*