# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**NORTH AMERICAN BUTTERFLY ASSOCIATION**,

      Plaintiff,

v.

**NIELSEN**, *et al.*,

      Defendants.

No. 1:17-cv-02651-RJL

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Timothy K. Beeken
(tkbeeken@debevoise.com)
Harry Zirlin
(hzirlin@debevoise.com)
David Donatti
(dadonatti@debevoise.com)

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
(212) 909-6000

June 15, 2018

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Facts ........................................................................................................................... 3

Argument .................................................................................................................... 7

    I.     The Court Has Jurisdiction over NABA's NEPA Claim ................................... 8

    II.    The Court Has Jurisdiction over—and NABA Has Stated—an ESA
          Claim ............................................................................................................... 12
          A.    The Court has jurisdiction over NABA's ESA claim .............................. 12
          B.    NABA has stated an ESA claim ............................................................. 14

    III.   The Court Has Jurisdiction over NABA's Fifth Amendment Claim ................ 16
          A.    Defendants' activities at the Butterfly Center constitute a taking ........... 16
          B.    The Tucker Act does not govern NABA's claim ..................................... 19

    IV.   NABA Has Stated a Claim for Relief under the Fourth Amendment ................ 20

Conclusion ................................................................................................................ 24

## TABLE OF AUTHORITIES

CASES

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)..................................................8

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................8

*Califano v. Sanders*, 430 U.S. 99 (1977) .....................................................................9

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986)........................................9, 11

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regulation, & Enf't*, 791 F.
   Supp. 2d 1158 (S.D. Ala. 2011)..............................................................................13

*Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980) .......................9

*Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347 (D.C. Cir. 2018) .....................12, 14

*Food and Water Watch v. EPA*, 5 F. Supp. 3d 62, 79–80 (D.D.C. 2013) .....................8

*Indep. Petroleum Ass'n. of Am. v. Babbitt*, 235 F.3d 588 (D.C. Cir. 2001) .................9

*Int'l Indus. Park, Inc. v. United States*, 80 Fed. Cl. 522 (2008) .............................23, 24

*Kidwell v. Dep't of the Army, Bd. for Correction of Military Records*, 56 F.3d 279
   (D.C. Cir. 1995) ....................................................................................................19

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .................................15

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005)....................................................16

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)................17, 18

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)..........................17, 18

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................12

*Marcin v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 3d 23, 26 (D.D.C. 2014)..............15, 22

*Public Citizen, Inc. v. Trump*, 29 F. Supp. 3d 6, 17 (D.D.C. 2018)............................12

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d
   726 (D.C. Cir. 2003) ..............................................................................................9

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).............................8

ii

*Role Models Am., Inc. v. White,* 317 F.3d 327 (D.C. Cir. 2003) .....................................9

*Sierra Club v. Van Antwerp*, 661 F. 3d 1147, 1155-56 (D.C. Cir. 2011) ....................14

*Smalls v. United States*, 471 F.3d 186 (D.C. Cir. 2006) .................................................19

*Soldal v. Cook Cty., Ill.*, 506 U.S. 56 (1992) ........................................................20, 21

*Tootle v. Sec'y of the Navy*, 446 F.3d 167 (D.C. Cir. 2006) ..........................................19

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016) ....................10

*United States v. Jacobsen*, 466 U.S. 109 (1984) ...........................................................20

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ........................20

*United States v. Romero-Bustamante*, 337 F.3d 1104 (9th Cir. 2003)...................22, 23

*Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473
    U.S. 172 (1985)...........................................................................................................9

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...................................19

**STATUTES**

5 U.S.C. § 704...................................................................................................................8

8 U.S.C. § 1103.................................................................................................................2

8 U.S.C. § 1357...............................................................................................................23

8 U.S.C. § 1357(a)(3)...........................................................................................3, 22, 23

16 U.S.C. § 1531 *et seq.*................................................................................................2, 14

16 U.S.C. § 1536(a)(2)....................................................................................................14

28 U.S.C. § 1491..............................................................................................................19

42 U.S.C. § 4321 *et seq.*.................................................................................2, 7, 8, 11, 14

42 U.S.C. § 4332(C) ..........................................................................................................8

**OTHER AUTHORITIES**

Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 30, 2017).......................................2, 4

Fed. R. Civ. P. 12(b)(1) ................................................................................................2

Fed. R. Civ. P. 12(b)(6) ..........................................................................................2, 21

Fernando Alfonso III, *Plans for Donald Trump's Border Wall on Texas Wildlife Refuge in the Works*, Houston Chronicle ....................................................................5

U.S. Const. amend. IV ................................................................7, 20, 21, 22, 23

U.S. Const. amend. V ........................................................2, 7, 16, 18, 19

https://www.merriam-webster.com .............................................................................23

Jeremy Schwartz and Maria Recio, *Budget Deal to Bring 33 Miles of Border Fence to Rio Grande Valley*, Austin American-Statesman ......................................5

Margaret Talev & Jennifer Jacobs, *Trump Advances Border Wall to Start Immigration Crackdown* ...........................................................................................4

Melissa del Bosque, *Records Show Where Trump Plans to Build Texas Border Wall* ..........................................................................................................................5

Nolan D. McCaskill, *Trump: Mexico Border Wall Construction to Begin 'in Months'* ......................................................................................................................4

1004336898v12

## INTRODUCTION

Defendants[1] tell this Court that now is too early for the North American Butterfly Association to challenge their decision to build a border wall on its property. Six or seven months from now, when the wall is already in place, they will surely tell this Court that it's too late to do anything about it.

Since early 2017, Defendants have federalized the North American Butterfly Association's ("NABA") property in Mission, Texas, the National Butterfly Center. Officers of Defendant Customs and Border Protection ("CBP") routinely and unreasonably pursue and detain Butterfly Center employees and guests. They invite others, including agents for the Texas Department of Public Safety ("DPS"), the Texas National Guard, as well as private contractors, to enter the Butterfly Center without any legal authorization or NABA's permission. They lock Butterfly Center employees off of NABA's property, remove the gates NABA erected to exclude others, and post guards on the property to deny employees and guests access to significant portions of NABA's own property. Defendants also install and monitor cameras and sensors without permission or revealing their location. In the sixteen years NABA has owned and operated the Butterfly Center, Defendants never intruded on the Butterfly Center to the degree that they have done so since early 2017.

---

[1] Defendants are Kirstjen M. Nielsen, *in her official capacity* as Secretary, United States Department of Homeland Security ("DHS"); Kevin K. McAleenan, *in his official capacity* as Acting Commissioner, United States Customs and Border Protection ("CBP"); Carla L. Provost, *in her official capacity* as Acting Chief, United States Border Patrol ("Border Patrol"); and Manuel Padilla, Jr., *in his official capacity* as Chief Patrol Agent, United States Customs & Border Protection Rio Grande Valley Border Patrol Sector.

1004336898v12

This escalation has a purpose.  Defendants' actions on and taking of NABA's private property coincide with presidential directives to "obtain complete operational control" of the southern border and "immediately plan, design, and construct a physical wall along the southern border."  Exec. Order No. 13767, 82 Fed. Reg. 8793 §§ 4(a), (d) (Jan. 30, 2017).  They correspond to the issuance of maps reflecting "a physical wall" along an existing levee on the Butterfly Center's property.  And these actions are related to the actual construction activity that occurred and continues to occur on NABA's property.

Defendants do not deny any of this.  Rather, in moving to dismiss NABA's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants argue first that NABA's statutory and Fifth Amendment claims are premature, and second that NABA has no enforceable rights at the Butterfly Center because it is an "open field" and, in any event, Defendant CBP is permitted to patrol private property within twenty-five miles of the border.  Defendants' arguments misconstrue the legal standards that apply to NABA's claims and misstate the facts.

To Defendants' first argument, Defendants appear to concede their obligations for the work being performed on NABA's property under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), 8 U.S.C. § 1103.  Their defense is that these obligations will only be triggered at some later date, apparently at a time of Defendants' choosing.

2

As for their second argument, Defendants' characterization of the entire Butterfly Center as an "open field" is a question of fact that cannot be resolved in their favor on a motion to dismiss, and their interpretation of the congressional authorization to "patrol" under 8 U.S.C. § 1357(a)(3) as a right to take "complete operational control" of private property is unsupported and wrong.

This dispute is ripe, this Court is the right one to adjudicate it, and NABA has stated claims upon which relief can be granted.

## FACTS

NABA is a nonprofit corporation and its mission is to conserve butterflies and their habitats.  In 2002, NABA purchased 100 acres in the Rio Grande Valley and acquired title in fee simple absolute.  NABA carefully developed and cultivated the land to become the Butterfly Center, with gardens and plantings specifically designed to support butterfly diversity.  Habitats that support butterflies also support biodiversity in other groups, and the Butterfly Center is a preserve and sanctuary for rare plants, mammals, birds, reptiles, and thousands of species of insects in addition to butterflies. Am. Compl. ¶¶ 46–50.  Certain plants and animals at the Butterfly Center are on the endangered species list.  *Id.* ¶¶ 48–50.  In addition to gardens, forests, and trails, NABA has built a visitors' pavilion, offices, a classroom, lodges, camping areas, sheds, blinds for wildlife photography, and nurseries to support its ecological and educational missions.  Am. Compl. ¶ 46; Declaration of Marianna Treviño Wright ¶ 3 (hereinafter "Wright Decl.").

3

A levee running roughly east-to-west divides the Butterfly Center into a northern third and a southern two-thirds.  The International Boundary and Water Commission ("IBWC") has an easement to maintain the levee for flood control purposes, but NABA's employees and guests are free to traverse the entire 100 acres of the property.  Much of the Butterfly Center's biodiversity is in the two-thirds of the property south of the levee, including in wetlands NABA restored to serve as a refuge for wading birds and dragonflies.

Since early 2017, Defendants have caused injuries to NABA's property rights in the Butterfly Center.  *See* Am. Compl. ¶¶ 53–62; Wright Decl. ¶¶ 6–12, 15–17, 21, 24–25.  The President mandated DHS "to immediately plan, design, and construct a physical wall along the southern border," Exec. Order No. 13767, 82 Fed. Reg. 8793 §§ 4(a), (d) (Jan. 30, 2017), and in public statements directed Defendants to take operational control of and construct a physical border wall along the United States border with Mexico.[2]  Am. Compl. ¶ 51.  DHS responded with the immediate "planning, design, construction, and maintenance of a wall."[3]  Am. Compl. ¶¶ 52–53.  In secret, Defendants and private contractors reportedly spent months determining the location of the border wall in

---

[2]  *See* Nolan D. McCaskill, *Trump: Mexico Border Wall Construction to Begin 'in Months'*, Politico (Jan. 25, 2017), attached to the Declaration of David Donatti, executed June 15, 2018, as Exhibit A; Margaret Talev & Jennifer Jacobs, *Trump Advances Border Wall to Start Immigration Crackdown*, Bloomberg (Jan. 24, 2017), Donatti Decl. Attachment B.

[3]  Memorandum from John Kelly, Secretary of Homeland Security, dated February 20, 2017, attached to the Declaration of Paul Enriquez, executed May 17, 2018 (Dkt. 25-2), at 5.

southern Texas.[4]  Even before this planning was revealed, Am. Compl. ¶ 54, a federal

official anonymously warned Butterfly Center employees that the wall would be built

along the levee in the Butterfly Center to connect to an existing segment of the border

wall west of the Butterfly Center.  Wright Decl. ¶ 6.

     After Butterfly Center employees discovered Defendants' contractors destroying

property along the levee, Am. Compl. ¶ 55, Defendant Padilla showed Marianna Treviño

Wright, Executive Director of the Butterfly Center, a map with the border wall running

along the levee.  Am. Compl. ¶ 56.  These determinations have not changed.[5]  Defendants

have made clear that "[i]n Hidalgo County, the 25 miles of new fencing would go on top

of flood levees and connect to 30 miles already built during the last round of border wall

construction a decade ago," "seal[ing] off the entire county."[6]

     Defendants' officers, affiliates, and contractors occupy and assert possessory

control over NABA's property in furtherance of their plan to seize operational control of

the Butterfly Center and build a border wall on it.  Wright Decl. ¶ 14.  Butterfly Center

employees continue to find private contractors on NABA's property without

authorization.  Am. Compl. ¶¶ 53, 61–62; Wright Decl. ¶ 20.

---

[4]   Fernando Alfonso III, *Plans for Donald Trump's Border Wall on Texas Wildlife Refuge in the Works*, Houston Chronicle (July 31, 2017), Donatti Decl. Attachment C.

[5]   *See* Melissa del Bosque, *Records Show Where Trump Plans to Build Texas Border Wall*, Texas Observer (Nov. 10, 2017), Donatti Decl. Attachment D.

[6]   Jeremy Schwartz and Maria Recio, *Budget Deal to Bring 33 Miles of Border Fence to Rio Grande Valley*, Austin American-Statesman (March 23, 2018), Donatti Decl. Attachment E.

As recently as April 30, 2018, Defendants requested an "irrevocable" right of entry to the Butterfly Center for a period of 18 months for "[t]he Government's officers, employees, agents, and contractors" in connection with "the Government's assessment of the Property for Border Infrastructure Projects in the Rio Grande Valley Sector."  Wright Decl. ¶ 23 & Attachment A.

Defendants intend to build a border wall along the levee on the Butterfly Center and they pursue their intent by trampling on NABA's property rights.  Defendants treat the Butterfly Center as though it is federal land with which they can do as they wish. Am. Compl. ¶¶ 55–62.

- CBP officers routinely harass NABA's employees and visitors, notwithstanding NABA's transparency about who these employees and visitors are and what cars they are driving.  Am. Compl. ¶ 61; Wright Decl. ¶¶ 5, 17–19.

- CBP (or its agents) have placed sensors and cameras on NABA's property that remain on NABA's property.  Am. Compl. ¶ 59.  Because Defendants refuse to reveal where this surveillance equipment is located, it is impossible to know what this equipment is transmitting and to whom.

- CBP has posted guards restricting employees and guests from crossing over the levee to the back two-thirds of the property.  Am. Compl. ¶ 62; Wright Decl. ¶ 18.

- CBP has placed its own locks on NABA's gates that NABA's employees cannot unlock, and have dismantled other gates meant to exclude

6

unauthorized guests, despite NABA providing CBP agents with keys to the Butterfly Center's gates.  Am. Compl. ¶ 60; Wright Decl. ¶¶ 21–22.

- CBP invites private contractors and additional law enforcement officers, including DPS, onto NABA's property.  Am. Compl. ¶ 53; Wright Decl. ¶ 20.  In addition to violating NABA's rights to determine who may or may not enter its property, the constant presence of these people on NABA's property creates logistical difficulties for the day-to-day operations of the Butterfly Center, as NABA must ascertain who these plainclothed individuals are.  Wright Decl. ¶¶ 8, 20.

These are not isolated incidents.  Since the beginning of 2017, Defendants have interfered constantly with NABA's property rights.  Their conduct threatens to destroy the Butterfly Center as a place people will wish to visit.  Without the financial support provided by visitors, the Butterfly Center will not be able to continue its mission.

## **ARGUMENT**

This Court has jurisdiction over NABA's NEPA, ESA, and Fifth Amendment claims, and the Amended Complaint properly states ESA and Fourth Amendment claims for relief.

7

## I.   The Court Has Jurisdiction over NABA's NEPA Claim

This Court has jurisdiction over NABA's NEPA claim because (i) Defendants have taken a definitive position that has direct and immediate effects on NABA's day-to-day business and (ii) Defendants have failed to fulfill their obligations under NEPA.

NEPA contains several "action-forcing" procedures, including the mandate to prepare an environmental impact statement ("EIS") for major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(C). Notwithstanding the impact of Defendants' determination and actions on the quality of the human environment, Defendants have failed to prepare an EIS.

The Administrative Procedure Act ("APA") provides courts with jurisdiction to review an agency's failure to prepare an EIS once the agency's action is "final."  5 U.S.C. § 704.  In this context, finality simply means whether the claims are ripe for adjudication. *See Food and Water Watch v. EPA*, 5 F. Supp. 3d 62, 79–80 (D.D.C. 2013).

Agency action is final (and, therefore, ripe) if "[i]t marks the consummation of the agency's decision-making process" and determines either "rights or obligations," or whether "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).[7]

---

[7]   The purpose of the requirement in the context of the APA is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

The test is not whether the agencies themselves have declared their action "final" but whether the challenged action bears the two hallmarks of finality articulated by the Supreme Court.  First, courts assess "whether the agency's position is 'definitive;'" second, courts assess "whether it has a 'direct and immediate . . . effect on the day-to-day business of the parties." *Indep. Petroleum Ass'n. of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001) (quoting *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980)).

On the first prong, a definitive position exists "[o]nce the agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position . . . ." *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 436 (D.C. Cir. 1986).

As to the second prong, agency action has a direct and immediate effect on the day-to-day operations when it "inflicts an actual, concrete injury." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985).  Agency action is "considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (citing *Role Models Am., Inc. v. White,* 317 F.3d 327, 331–32 (D.C. Cir. 2003)).

Applying these principles here, it is clear that Defendants have taken a definitive position with a direct and immediate effect on NABA.  First, the Executive Order and other public statements by the President, then-Secretary of DHS Kelly's Memorandum, *supra* note 3, various maps demonstrating where the border wall will cut through

9

NABA's property, and actual construction activity on the Butterfly Center demonstrate that, in fact, Defendants have definitively determined that the border wall will be built on NABA's property.

Second, Defendants acted on this determination in ways that have caused—and continue to cause—actual injury to NABA.  Defendants are engaged in construction activities along the levee on NABA's property and—without any communication or semblance of transparency—continue inviting contractors onto the Butterfly Center. Defendants treat the Butterfly Center as federal property and track, detain, and restrict individuals seeking to exercise their lawful right to access the southern two-thirds of the Butterfly Center.  In totality, this conduct reflects a definitive decision that impacts NABA every day.

That CBP may ultimately change its mind over its decision to build a wall on the Butterfly Center is not dispositive.  Indeed it is a "common characteristic" of final agency decisions that they may be reversed, and the ability to revise a position "does not make an otherwise definitive decision nonfinal."  *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016).  CBP could change its mind right up to the point the wall is built, at which time more irreversible damage will have been done.

Defendants argue that NABA' First Claim for Relief should be dismissed.  They seize on the word "preparation" in NABA's Complaint and argue that preparation for construction is not the same as construction, Defs.' Mem. 13; they claim that construction activity was merely "brush clearing" that has since ceased, *id.* at 14; and they argue that neither the President's Executive Order nor the Memorandum from the Secretary of DHS

10

ordering the immediate planning, design, construction, and maintenance of a wall constitutes final agency action, *id.* at 17–18.  Defendants additionally make the circular argument that their ongoing failure to fulfill NEPA's requirements demonstrates that no final agency action has occurred, *id.* at 16–17.  Having acknowledged that, in the context of NEPA, a "final agency action inquiry is closely related to the question of ripeness," *id.* at 12, Defendants assert that these arguments show the agencies' conduct is not "final" and that NABA's claims are not ripe for review.

Defendants' arguments fail by discussing certain facts in isolation rather than as a whole continuing course of conduct.  Defendants fail to address the totality of the circumstances demonstrating that they have made a definitive decision about border wall construction on the Butterfly Center and this decision has caused injury to NABA. Courts must "apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435 (D.C. Cir. 1986); *see also id.* at 435 n.7 (stating that "Congress gave no indication that it intended the finality requirement to be applied in [a] hypertechnical fashion" or that "the cumulative effect of the agency's actions" was unreviewable).  By atomizing their conduct, Defendants seek to evade the clear practical and legal consequences that flow from their actions as a whole. Defendants' formalistic demand that NABA identify material from a record it controls to demonstrate final agency action is neither "flexible" nor "pragmatic" and therefore misapplies the applicable legal standards.

Because Defendants' definitive decision has caused actual injury to NABA, Defendants' final agency action is ripe for review.  "'At the pleading stage, general

factual allegations of injury resulting from the defendant's conduct' will often suffice" to demonstrate standing to proceed. *Public Citizen, Inc. v. Trump*, No. 297 F. Supp. 3d 6, 9 (D.D.C. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Where a 12(b)(1) motion has been made and there has yet to be any discovery, "the Court must accord Plaintiffs 'the benefit of all reasonable inferences,' and, in the absence of 'evidentiary offerings,' the Court must avoid 'assessing the credibility of [their] allegations.'" *Id.* at 17 (quoting *Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018) (brackets in original)).

Defendants' Motion to Dismiss NABA's First Claim for Relief should be rejected.

## II.   The Court Has Jurisdiction over—and NABA Has Stated—an ESA Claim

The Court has jurisdiction over NABA's Second Claim for Relief because Defendants have authorized, funded, and continue to carry out activities on NABA's property without fulfilling their obligations under the ESA.

### A.   *The Court has jurisdiction over NABA's ESA claim*

The Court has jurisdiction over NABA's ESA claim because Defendants have authorized, funded, and carried out activities on the Butterfly Center that impact threatened species, and continue to neglect their obligations under the ESA.

Defendants do not dispute the ESA's requirements, instead making the twin arguments that NABA's ESA claim is not ripe or, in the alternative, it is moot.

12

Defendants' argument that NABA's ESA claim is not ripe fails because Defendants have authorized, funded, and carried out activities on the Butterfly Center. Defendants have begun construction activity along the levee on NABA's property and continue inviting contractors onto the property.  This is not a case where Defendants have enabled future harm, Defs.' Mem. at 20, but one in which the government already is engaged in activity on NABA's property that threatens endangered species there.  *Cf.* *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, *Regulation, & Enf't*, 791 F. Supp. 2d 1158, 1171-72 (S.D. Ala. 2011) ("Thus, plaintiff has framed the challenged conduct on which Claim Four is grounded as being actions that BOEMRE has taken and is taking now . . . .").  Because Defendants have caused actual injury to NABA, NABA's ESA claim is ripe to proceed.[8]

Defendants argue in the alternative that NABA's ESA claim is moot.  This argument, too, fails.  Defendants continue to carry out destructive construction activities on NABA's property.  Wright Decl. ¶ 20.  Where a motion to dismiss a complaint presents a dispute over the factual basis of the court's subject matter jurisdiction, this Court "'must go beyond the pleadings and resolve any disputed issues of fact . . . necessary to a ruling []on the motion to dismiss'" after ensuring that Plaintiffs have been afforded "'ample opportunity to secure and [to] present evidence relevant to the existence

---

[8]   Defendants also claim this Court lacks jurisdiction because NABA's notice of the claim was premature.  Defs.' Mem. 22–23.  This argument is not legally distinct from Defendants' assertion that NABA's ESA claim is not ripe.  NABA did not provide the Secretary of the Interior with notice that an ESA claim may one day develop.  NABA's notice regarded actual and ongoing construction activity on NABA's property.

13

of jurisdiction.'"  *Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018)

(citation omitted).  As Ms. Wright's Declaration shows, Defendants' activities on

NABA's property are ongoing.

### B. _NABA has stated an ESA claim_

NABA has stated an ESA claim for Defendants' failure to comply with the Act's

requirements.  Defendants are required to ensure, in consultation with the Fish and

Wildlife Service ("FWS"), "that any action authorized, funded, or carried out by such

agency . . . is not likely to jeopardize the continued existence of any endangered species

or threatened species or result in the destruction or adverse modification of habitat of

such species[.]"  16 U.S.C. § 1536(a)(2).  The ESA is more demanding than NEPA, as it

requires an agency to engage in a formal consultation if it determines that the action in

question "'*may affect* listed species or critical habitat.'"  *Sierra Club v. Van Antwerp*,

661 F. 3d 1147, 1155-56 (D.C. Cir. 2011) (citation omitted).  Though Defendants'

actions will affect several threatened and endangered species, Am. Compl. ¶¶ 5, 4850,

Defendants have failed to consult with FWS for their past and ongoing conduct on the

Butterfly Center.  16 U.S.C. § 1531 *et seq.*; Am. Compl. ¶¶ 53–56.

NABA provided notice of Defendants' failure to fulfill their obligations to the

Secretary of the Interior, Am. Compl. ¶ 78, and Defendants' have failed to cure this

failure for over 60 days.

14

Defendants claim that they have not carried out activities on NABA's property, and in the alternative that their conduct does not impact threatened species.  Defs.' Mem. at 23–24.

Defendants' arguments should be rejected because they turn on factual disputes that are not appropriately resolved on a motion to dismiss.  *Marcin v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 3d 23, 26 (D.D.C. 2014) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  Moreover, Defendants have in fact carried out construction activities on NABA's property.  These activities have in themselves caused injury to NABA.  They also are consistent with Defendants' mandate to immediately plan and construct a wall along the southern border and their determination to do so on the Butterfly Center.

Defendants' claim that these acknowledged activities fall within the ambit of a 2014 informal ESA consultation is incorrect.  Defs.' Mem. 23–24.  Defendants argue that they performed the necessary consultation with FWS for tactical road maintenance activity.  In truth, Defendants' activities since 2017 substantially "widened" an existing and well-maintained road, Am. Compl. ¶ 53; Wright Decl. ¶¶ 7–8, and surveyor flags indicate that Defendants' activities would imminently occur beyond the road.  Even if the consultation covered the same activity that occurred since 2017, Defendants' consultation did not refer to the majority of threatened or endangered species identified in NABA's Complaint, including the Slender Rushpea, Tamaulipan Kidneypetal, Texas Tortoises, and Texas Indigo Snakes.  Am. Compl. ¶ 49.  Defendants' argument that "[p]resumably, Plaintiff would not locate dedicated refugia for ESA-listed plants immediately adjacent to

15

roads," Defs.' Mem. 24–25, misses the mark:  the ESA requires consultation so that agencies will not make such presumptions.

Defendants' Motion to dismiss NABA's Second Claim should be rejected.

**III.    The Court Has Jurisdiction over NABA's Fifth Amendment Claim**

Defendants' activities at the Butterfly Center constitute a taking of NABA's private property.  This Court may determine NABA's Third Claim for Relief.

   **A.    *Defendants' activities at the Butterfly Center constitute a taking***

The Fifth Amendment contains two property-related guarantees: "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.

Defendants' conduct—controlling where employees and guests may go, destroying and modifying the Butterfly Center for their own purposes, and their continual physical presence—is a physical intrusion that is impermissible in the absence of due process.  Physical intrusions lie at the heart of Fifth Amendment takings jurisprudence. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) ("The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property.").  A permanent physical invasion of property, however minor, is a *per se* taking.  *Id.* at 540 ("[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just

compensation."); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982).

Defendants have usurped NABA's right to exclude others from the Butterfly Center by, among other things, regularly inviting non-CBP law enforcement officers and private contractors onto NABA's property.  "[T]he owner's right to exclude others from entering and using her property [is] perhaps the most fundamental of all property interests."  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). Defendants have additionally undermined NABA's right to exclude others by dismantling NABA's gates and otherwise failing or refusing to lock them, and by adding locks to prevent NABA's entry to its own property.  Justice Scalia focused on this right to exclude in *Lucas*, indicating that in the event of regulations that compel the property owner to suffer a physical invasion, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation."  *Id.* at 1015.

Even Defendants' installation of sensors and cameras constitutes a *per se* physical taking.  In *Loretto*, the Supreme Court found a taking where a statute authorized a television cable company to install metal boxes on rental buildings in Manhattan that occupied a mere 1.5 cubic feet.  *See Loretto*, 458 U.S. at 438 n.16.  Where, as here, the government action is a permanent physical invasion, "[Supreme Court] cases uniformly have found a taking . . . without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner."  *Id.* at 434.  This *per se* rule is justified because a "permanent physical occupation" of property is perhaps the most serious form of invasion since the government is "not simply tak[ing] a single 'strand'

17

from the 'bundle' of property rights: it [is] "chop[ping] right through the bundle, taking a slice of every strand." *Id.* at 435.

Defendants' intrusion into NABA's property is exacerbated by Defendants' refusal to disclose the locations of their and other law enforcement agencies' cameras and sensors. "To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury." *Loretto*, 458 U.S. at 436. A physical invasion of the kind at issue here is "qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion." *Id.*

Defendants' argument that NABA's Fifth Amendment claim is not ripe because they have not made a formal decision to acquire the property utterly ignores that Defendants act as though they already own the property by, among other things, altering the property, inviting state law enforcement and private contractors onto the property, restricting employees' and guests' access into and around the Butterfly Center, installing permanent equipment, changing locks, and removing gates. This seizure of private property without notice, hearing, or compensation is the exact form of government action that the Fifth Amendment was designed to prevent. *Lucas*, 505 U.S. at 1019. Defendants cannot exempt themselves from constitutional requirements by relying on a formal distinction of their own creation. Without judicial intervention, Defendants will continue to disregard their constitutional and statutory obligations.

18

**B.   *The Tucker Act does not govern NABA's claim***

Defendants' argument that the Tucker Act governs NABA's Fifth Amendment claim is incorrect.  The Tucker Act is a grant of jurisdiction based on monetary requests, which we are not seeking now.  *See* 28 U.S.C. § 1491.  Monetary relief is not the only remedy for a takings claim.  When an unlawful taking of property is alleged, a district court may issue an injunction.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (holding injunction by a district court was an appropriate remedy for "unlawfully taken" property).

The D.C. Circuit has adopted a bright-line rule to determine when cases must be brought under the Act.  *Smalls v. United States*, 471 F.3d 186, 189 (D.C. Cir. 2006).  A claim must be brought under the Act only if "in essence it seeks more than $10,000 in monetary relief from the federal government."  *Id.* at 190 (quoting *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006)) (internal quotation marks omitted).  The inquiry as to whether the Act governs is generally limited to the "four corners of the complaint," excluding even the "automatic consequences" of a plaintiff's victory.  *Id.* (quoting *Kidwell v. Dep't of the Army, Bd. for Correction of Military Records*, 56 F.3d 279, 285 (D.C. Cir. 1995)) (internal quotation marks and citation omitted).

NABA has not sought money damages in the Amended Complaint, and any cost to Defendants of complying with this Court's directives are irrelevant to whether the Tucker Act governs.  Where the plaintiff's complaint only requests non-monetary relief with "considerable value" independent of future monetary relief, a court will "respect the plaintiff's choice of remedies."  *Kidwell*, 56 F.3d at 284.

19

Defendants' Motion to Dismiss NABA's Third Claim for Relief should be denied.

## IV.     NABA Has Stated a Claim for Relief under the Fourth Amendment

Defendants have interfered systematically and meaningfully with NABA's possessory interests.  Defendants routinely and unreasonably pursue and detain Butterfly Center employees and guests on NABA's property, invite agents of Texas law enforcement bodies onto the property, post guards to supervise and control NABA's employees and guests on the property, lock Butterfly Center employees off of NABA's property and remove the gates NABA erected to exclude others.  The placement of permanent surveillance equipment on the property is both a permanent and intrusive search on NABA's property and a seizure thereof.  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (stating that government conduct constitutes a Fourth Amendment "seizure" of property when "there is some meaningful interference with an individual's possessory interests in that property.").

If a search or a seizure has occurred, courts determine if the intrusion was "reasonable." *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 63 (1992).  "[W]here more substantial invasions of constitutionally protected interests are involved," the Supreme Court has held that "a warrantless search or seizure is unreasonable in the absence of exigent circumstances." *Jacobsen*, 466 U.S. at 125 n.28 (internal citations omitted). "Real property" is the most protected property interest, and the seizure of real property is unreasonable absent a warrant or exception. *United States v. James Daniel Good Real*

20

*Prop.*, 510 U.S. 43, 54 (1993).  Defendants have routinely, systematically, and substantially invaded NABA's constitutionally protected real property.

Defendants have not denied these activities, instead claiming that the Butterfly Center is not protected by the Fourth Amendment because it is an "open field" and, in any event, Defendants' right to "patrol" the property "circumscribe[s] the reach of the Fourth Amendment in this border crossing area."  Defs.' Mem. 36–37.

Defendants' arguments fail for two reasons.  First, Defendants' arguments, based on the status of NABA's property, turn on factual disputes that are not properly resolved on a Rule 12(b)(6) motion to dismiss.

Whether a seizure is permissible turns on the nature and extent of the government's interference with possessory interests, rather than on the property owner's expectation of privacy.  *Soldal*, 506 U.S. at 65 ("We thus are unconvinced that . . . the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty interests are also implicated.").  Though the permissibility of a government search does depend on the property owner's expectation of privacy, whether the Butterfly Center is an "open field" is a question of fact that cannot be resolved in Defendants' favor on a 12(b)(6) motion to dismiss.

The Butterfly Center contains a diverse array of enclosed structures as well as open areas.  Decl. of Marianna Treviño Wright ¶ 3.  The "tens of thousands" of visitors each year convene at a Visitor's Pavilion.  Am. Compl. ¶ 46.  The "thousands of local schoolchildren" learn in "educational exhibits."  *Id.*  Meetings, including the meeting between Marianna Treviño Wright and Defendant Padilla described in NABA's

21

Complaint, are held in offices. *Id.* ¶ 58.  A liberal construction of these allegations and

the inferences that may be drawn from them precludes dismissing this claim based on

Defendants' conclusory allegation that the Butterfly Center is an open field. *See Marcin,*

50 F. Supp. 3d at 26.

Second, Defendants' arguments based on the Butterfly Center's proximity to the

border and on Defendant CBP's authority to "patrol" misconstrue the legal standards that

apply to NABA's claims and misstate the facts.  Defendants' argument that Fourth

Amendment protections are "even more limited" at the border, Defs.' Mem. 36, begs the

question of whether Defendants' conduct on the Butterfly Center is permissible.  Citizens

have Fourth Amendment rights at the border, and to consider otherwise "would provide

[Border Patrol] agents the unchecked ability to enter every backyard in metropolitan San

Diego, Detroit, Buffalo, and El Paso, all of which are well within twenty-five miles of

external borders of the United States." *United States v. Romero-Bustamente*, 337 F.3d

1104, 1109 (9th Cir. 2003).

Defendants' claim that 8 U.S.C. § 1357(a)(3), which allows "access to private

lands, but not dwellings, for the purpose of patrolling the border," serves as an

authorization for their broad operations on NABA property also fails.  Defendants

claim—without citing to any support—that Congress's authorization of access "for the

purpose of patrolling the border" "affirm[s] CBP's right to the lands at issue."  Defs.'

Mem. 37.  In a footnote, Defendants assert that NABA's issue is therefore with Congress

itself, and that NABA's claim might therefore be better interpreted as a "regulatory

taking." *Id.* at 37 n.12.

22

If NABA considered that Congress intended 8 U.S.C. § 1357 to provide Defendants' with unbounded authority over the Butterfly Center, NABA would indeed assert that a regulatory taking occurred. *See Int'l Indus. Park, Inc. v. United States*, 80 Fed. Cl. 522, 525 (2008) ("[T]he legality of an exercise of police power does not necessarily preclude a taking claim."). But NABA does not believe this to have been Congress's intent in allowing "*access to private lands, but not dwellings*, *for the purpose of patrolling the border*." 8 U.S.C. § 1357(a)(3) (emphasis added). The plain text of the statute places limits on CBP's authorization. *See Romero-Bustamante*, 337 F.3d at 1109 (finding that 8 U.S.C. § 1357's authorization of "patrol" did not abrogate the individuals' Fourth Amendment rights, and that Congress excluded the curtilage of a home as well as "dwellings" from the scope of the authorization).

The statute only authorizes CBP to patrol private property. Defendants do not suggest that authorizing "access" implies the authority to exclude, to invite, to destroy or otherwise modify, or to place permanent electronic surveillance upon. CBP's access is further limited by the "purpose of patrolling the border." *Id.* The plain meaning of "patrol" includes movement upon, and does not include permanent stationing and occupation, placement of surveillance equipment upon, or exercise of operational control.[9] In any event, "[t]he relationship between the Defendant[s'] rights and the

---

[9]   The dictionary defines "patrol" as "the action of traversing a district or beat or of going the rounds along a chain of guards for observation or the maintenance of security." *Patrol*, Merriam-Webster, https://www.merriam-webster.com/dictionary/patrol.

23

Plaintiff's rights are fact-intensive issues, to be resolved at trial." *Int'l Indus. Park, Inc.*, 80 Fed. Cl. at 528.

Defendants' Motion to Dismiss NABA's Fourth Claim for Relief should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiff NABA requests that the Court deny Defendants' Motion to Dismiss and grant Plaintiff such further relief as it deems just and proper. NABA respectfully requests oral argument be heard on Defendant's Motion to Dismiss.

Dated: New York, New York
      June 15, 2018

DEBEVOISE & PLIMPTON LLP

By: *s/Timothy K. Beeken*
Timothy K. Beeken (N.Y. Bar No. 2492650)
(tkbeeken@debevoise.com)

Harry Zirlin
(hzirlin@debevoise.com)
David Donatti
(dadonatti@debevoise.com)
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Plaintiff*