# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTH AMERICAN BUTTERFLY ASSOCIATION, *a nonprofit organization located at* 4 Delaware Road, Morristown, NJ 07960,<br><br>Plaintiff,<br><br>-against-<br><br>ALEJANDRO MAYORKAS, *in his official capacity as* Secretary, UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, *in his capacity as* Senior Official Performing the Duties of the Commissioner, U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as* Chief, UNITED STATES BORDER PATROL; AUSTIN L. SKERO, *in his official capacity as* Acting Chief Patrol Agent, UNITED STATES CUSTOMS & BORDER PROTECTION RIO GRANDE VALLEY BORDER PATROL SECTOR,<br><br>Defendants. | Civil Case No. 17-2651 (RJL)<br><br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

The North American Butterfly Association ("NABA"), for its Second Amended

Complaint seeking declaratory and injunctive relief against Defendants based on Defendants'

ongoing interference with the operations of NABA's National Butterfly Center, the harassment

of NABA's staff, and persistent violations of NABA's property rights for no legitimate purpose

and without due process of law, alleges as follows through its undersigned attorneys:

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  The

claims for relief arise under the United States Constitution.

## VENUE

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e) because the violations are occurring in this district and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by Defendants and/or failures to act by Defendants.

## PARTIES

3.    NABA is incorporated as a nonprofit under the laws of the State of New York and Section 501(c)(3) of the Internal Revenue Code.  It is headquartered in Morristown, New Jersey, and its mission is to conserve butterflies and their habitats.  NABA owns and operates the National Butterfly Center (the "Butterfly Center"), a 100-acre wildlife sanctuary and botanical garden in South Texas.  The Butterfly Center abuts the Rio Grande and is a part of the United States Fish and Wildlife Service's Lower Rio Grande Valley Wildlife Corridor.

4.    Defendant Alejandro Mayorkas, Secretary of the Department of Homeland Security ("DHS"), is sued in his official capacity.  Under federal law, Secretary Mayorkas is the official ultimately responsible for ensuring that the actions and management decisions of DHS and its constituent agencies comply with all applicable laws, regulations, and policies.

5.    Defendant Troy Miller, Senior Official Performing the Duties of the Commissioner of Customs and Border Protection ("CBP"), is sued in his official capacity. Under federal law, Acting Commissioner Miller is the official ultimately responsible for ensuring that the actions and management decisions of CBP comply with all applicable laws, regulations, and policies.

6.    Defendant Rodney S. Scott, Chief of the United States Border Patrol, is sued in his official capacity.  Under federal law, Chief Scott is the official ultimately responsible for

ensuring that the actions and management decisions of Border Patrol comply with all applicable laws, regulations, and policies.

7.     Austin L. Skero, Acting Chief Patrol Agent of Customs and Border Protection, Rio Grande Valley Border Patrol Sector, is sued in his official capacity.

## FACTS

8.     The National Butterfly Center is a 100-acre wildlife sanctuary and botanical garden for native species located on the Rio Grande near the city of Mission in southern Texas. Each year the Butterfly Center receives thousands of visitors, who pay an entrance fee to access the grounds and its various features and facilities.  A substantial portion of that number represents schoolchildren on class field trips who visit the Butterfly Center for educational purposes.

9.     The Butterfly Center is the premier place in the United States to see and learn about wild butterflies, many of which are endangered.  More than 230 species of butterflies have been seen at the Butterfly Center and, on any given day, visitors can see as many as 200,000 individual butterflies on its grounds.

10.     The 100-acre tract occupied by the Butterfly Center is bordered to the south by the Rio Grande; to the north by West Military Road; to the west by North Schuerbach Road and federal property; and to the east by private property owned by Mike Rhodes (south of the levee) and the United Irrigation District reservoir (north of the levee).

11.     A flood levee—topped by a broad gravel road—cuts across the Butterfly Center's property.  The federal government holds a non-possessory easement to access the levee road for the purpose of operating and maintaining the levee for flood control purposes.  This embankment separates the "lower" 70 acres that border the Rio Grande at the southern end of

3

NABA's property from the "upper" 30 acres where the Butterfly Center's entrance and Visitors' Pavilion are located.  The levee is perpendicular to North Schuerbach Road, which crosses the levee and serves as the primary vehicular entrance to the lower 70 acres for NABA staff and visitors.

12.     The Butterfly Center property has eight gates.  There are three along West Military Road, two on Schuerbach Road, one immediately north of the levee, one just south of the levee, and one in the southeast corner of the property between Rhodes's land and the Butterfly Center.  The two gates most used by both Butterfly Center staff and CBP are (i) the unpainted steel bollard gate just north of the levee and (ii) the yellow steel bollard gate just south of the levee.

13.     After passing through the Butterfly Center entrance, visitors are greeted in the northern 30 acres by the Chrysalis Visitors' Pavilion, which is surrounded by the Texas Butterfly Gardens, Olive Circles, Hungry Caterpillar Playscape, Monarch Palapa, birding area (including a photo blind), bee gardens, native plant nursery (for growing plants for use at the Center and for retail), butterfly conservatory, outdoor classroom, restrooms, outdoor solar-powered charging station with picnic table, and numerous walking trails.

14.     Upon crossing the levee, visitors enter the southern 70 acres of the Butterfly Center, which similarly contain numerous walking trails that intersect with conscientiously zoned areas that are cultivated to create habitats specific to particular species—both animal and plant—many of which are designated as threatened or endangered under the Endangered Species Act.  On the lower 70 acres, the Butterfly Center has created a resaca, and has erected two photo blinds, a covered pavilion, a boardwalk and a fishing and observation dock, and it maintains a series of dirt trails.

4

15.     Among many cultivation and conservation projects, the Butterfly Center partnered with the U.S. Fish and Wildlife Service to create a refugium for the endangered Slender Rushpea (*Hoffmannseggia tenella*) and continues to collaborate with U.S. Fish and Wildlife Service to develop additional refugia for the Tamaulipan Kidneypetal (*Ayenia limitaris*) and Walker's Manioc (*Manihot walkerae*), two other endangered plant species.

16.     Additionally, on information and belief, there are a number of federally endangered aquatic species that live in the Mission Main Canal that flows through the Butterfly Center, for which staff endeavor to provide suitable habitat, including by installing plantings to prevent erosion and stabilize the existing riverbank.

17.     Since its creation in 2002 on the site of a former onion farm, the Butterfly Center has invested heavily in developing infrastructure to support protected plants and animals as well as creating spaces for visitors to learn about native species. For example, NABA has constructed a Visitors' Pavilion, designed by the principal architect of the Holocaust Museum in Washington, D.C.; cultivated sunken gardens, species gardens, and a butterfly promenade; paved pathways and a parking lot; re-roofed the monarch palapa every five years; and installed a butterfly conservatory and outdoor classroom, as well as numerous other general maintenance and habitat cultivation projects.

18.     To build and maintain the many specifically tailored plant and animal sanctuaries throughout the Butterfly Center, staff daily traverse the reaches of the property. Tools and heavy equipment are generally stored in service buildings on the upper 30 acres and routinely transported to the lower 70 acres for use in grounds maintenance and construction. Visitor enjoyment and the viability of habitats are contingent on the successful maintenance of the Butterfly Center's environments, which require ongoing ready access.

19.     Given its location along the Rio Grande, the Butterfly Center has long cooperated with Border Patrol agents engaged in patrolling the border for illegal immigration.  Butterfly Center staff are alert to potential trafficking and smuggling activity on the border and, to this day, report any incidents they witness to CBP.

20.     Indeed, Congress granted immigration officers the "power without warrant . . . to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3) (emphasis added). "Patrolling the border," however, is defined as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c). The authority to patrol is not limitless, and seizure of private land through arbitrary and continuous interference with landowners' property rights does not fall within the authority to patrol.

21.     Prior to 2017, CBP agents were respectful of the Butterfly Center's property and professional in their interactions with staff, but in early 2017, following Donald Trump's accession to the presidency, CBP began to deviate from professionalism and cooperation to interference, intimidation, and harassment of Butterfly Center staff and visitors.  This new conduct by CBP also coincided with the increased presence of Texas State Police, State Park Police, Mission Police, U.S. Fish and Wildlife Service Police, Hidalgo County Sheriff's Officers, Hidalgo County Constables, International Boundary and Water Commission law enforcement, and the advent of United States National Guard and United States Army personnel presence, as well as the appearance of government-retained contractors.  All these agencies and individuals were, upon information and belief, brought onto NABA's property by or with CBP or otherwise encouraged by CBP to establish a presence on NABA's property.

22.     On June 30, 2017, CBP detained Butterfly Center Director of Operations Max

Muñoz, his two young daughters, and two other employees as they drove across the lower 70

acres.  CBP additionally called in a helicopter and police units.  On information and belief, CBP

was aware of Muñoz's identity and was not patrolling for illegal immigration at the time.

Marianna Wright, Executive Director of the Butterfly Center, reported this incident to then-CBP

Patrol Agent in Charge Melissa Lucio of the Rio Grande Valley Border Patrol Sector.  Agent

Lucio responded that, in spite of the agency having on file the names of all Butterfly Center

staff and their vehicle information, it was too much trouble to communicate this information to

CBP agents who worked in the vicinity of the Butterfly Center.

23.     On July 20, 2017, Wright discovered a work crew on Butterfly Center property.

The crew was using a brush hog, an articulating brush boom and chainsaws to cut down trees,

mow down brush and widen the levee road, without notice to or consultation with the Butterfly

Center.  The crew had cleared up to eighteen feet on each side of the existing roadway, which

already had been wide enough for large vehicles to pass in opposite directions.  The road is

well-maintained by Butterfly Center staff, who routinely use it for Butterfly Center activities.

24.     Upon being questioned by Wright, the supervisor, Peter Sydow, informed her that

CBP had told him to cut brush on the Butterfly Center's land from the levee to the Rio Grande,

saying specifically, "we were sent to clear this land, 1.2 miles to the river for border wall

construction."

25.     Wright reported the incident to Jose Acosta, her Community Border Liaison at

CBP, who denied knowledge of the incident.  The next day, five CBP agents from the local

McAllen Field Office and the Rio Grande Valley Sector Command Office, led by Agent Xavier

Rios, stopped at the Butterfly Center, on information and belief, to confront Wright, who suggested that they see the construction work for themselves.

26.     In the following days, CBP Agent Rodriguez called Wright and informed her that CBP had in fact ordered the construction work and that it was related to "tactical infrastructure."

27.     On August 1, 2017, then-Chief Patrol Agent Manuel Padilla, Jr. visited the Butterfly Center unannounced, accompanied by two other agents, and confirmed that CBP had sent the contractors who had cleared the Center's land on either side of the road.  He showed Wright proposed border wall plans.  Under the construction plan Chief Padilla showed to Wright, NABA would lose access to two-thirds of its property—every acre from the levee to the river.

28.     During this conversation, Chief Padilla also informed Wright that CBP had placed sensors on NABA's property.  Chief Padilla refused, however, to disclose further information about the sensors, including their type or location.  Chief Padilla claimed authority under CBP's patrol power to "take operational control" of NABA's property for purposes of border wall construction.  He informed Wright that private contractors with CBP's Comprehensive Tactical Infrastructure Maintenance and Repair Division would return, this time with a "green uniform presence."

29.     On August 8, 2017, Wright and Ana Garcia, a representative of U.S. Senator John Cornyn, were twice detained as they drove around the Butterfly Center while Defendants' officers appeared to follow them and observe their activities.  On information and belief, CBP was aware of Wright's identity and was not patrolling for illegal immigration at the time.

30.     On November 27, 2017, three of NABA's guests were separately prevented by Defendants' agents from walking over the levee to the south side of the Butterfly Center.  On information and belief, Border Patrol was not patrolling for illegal immigration at the time.

31.     In addition to making direct verbal statements and physically blocking access, CBP restrains the free movement of Butterfly Center staff and guests through intimidation, including by approaching visitors at a high rate of speed, often with emergency lights engaged. CBP agents on Butterfly Center land carry handguns that are prominently holstered on their waist, a practice that adds to the aura of intimidation.

32.     On February 6, 2018, while Wright and documentary filmmakers for "The River & The Wall" stood on the south side of the levee at the Butterfly Center, a CBP helicopter hovered overhead for nearly ten minutes.  On information and belief, CBP was not patrolling for illegal immigration at the time and acted with intent to harass NABA personnel and guests.

33.     On February 10, 2018, at least five vehicles confronted a Butterfly Center employee and fifteen Texas Master Naturalists as they walked on the property south of the levee.  On information and belief, CBP was not patrolling for illegal immigration at the time and acted with intent to harass NABA personnel and guests.

34.     On April 11, 2018, Wright and a news team from KRGV Channel 5, an ABC affiliate, encountered men in plainclothes inside a civilian vehicle.  When confronted by Wright, they refused to produce identification or credentials and claimed they were on NABA's property as part of a sensor crew, then fled the property.  Defendants originally disclaimed knowledge of the vehicle and its occupants, but they eventually confirmed that the crew was working on behalf of CBP and the Texas Department of Public Safety, through a shell

company, Alexis Engineering, in connection with a Department of Public Safety program to deploy remote cameras to aid in the detection of drug and human trafficking operations.

35.     On July 22, 2018, Border Patrol Agent Victor J. Agostini told Wright that she was "the most hated woman" at CBP and that her picture was on display in the officers' break room at CBP's McAllen Station.

36.     On November 6, 2018, during the final banquet of the Texas Butterfly Festival on NABA's property, and for no apparent reason, a CBP helicopter hovered over the reception for twenty minutes during the keynote address.  CBP's actions disrupted the gathering by rendering the speaker inaudible to most attendees.  The helicopter departed when the event concluded. CBP had in the same way interrupted the final banquet of the Texas Butterfly Festival in 2017 and did so again in 2019.  On information and belief, CBP was aware of the nature and purpose of all three events, was not patrolling for illegal immigration at the time, and acted with intent to harass NABA personnel and guests.

37.     On November 10, 2018, the Butterfly Center hosted a ritual remembrance ceremony for the Carrizo/Comecrudo Tribe of Texas.  Tribe members on their way to the event stopped to ask for directions from CBP agents.  The agents falsely told the tribe members that the Butterfly Center was closed and instructed them to leave the area.  On information and belief, CBP was not patrolling for illegal immigration at the time and acted with intent to harass NABA and its guests.

38.     On November 15, 2018, two CBP agents confronted an independent filmmaker hired by NABA while he was filming on NABA's property.  The filmmaker identified himself and confirmed that he had been retained by NABA to film at the Butterfly Center, but CBP nevertheless ordered him to leave.  CBP never explained why the Butterfly Center was not

allowed to film or direct photography on its own property.  On information and belief, CBP was not patrolling for illegal immigration at the time and acted with intent to harass NABA and its guest.

39.     On February 4, 2019, Wright and NABA Founder and President Jeffrey Glassberg met with government appraisers on the levee road.  At least four CBP agents, including two on horseback, stood nearby throughout the meeting.  Three patrol units conducted drive-bys during this discussion, and one unit parked next to Wright, Glassberg, and the appraisers.  On information and belief, CBP was aware of Glassberg and Wright's identities, was not patrolling for illegal immigration at the time and acted with intent to harass and intimidate them.

40.     Beginning on February 3, 2019, DHS subcontractor Foremost Paving, Inc., along with agents from CBP, Texas State Police, State Park Police, the Mission Police Department, and the U.S. Fish and Wildlife Service, began driving SUVs, light trucks, and heavy machinery across NABA's property on a daily basis.  Defendants did not ask permission to cross the Butterfly Center from anyone at NABA and did not notify anyone at the Butterfly Center of what was taking place.  On information and belief, the CBP agents knew at the time that their contractors and agents were crossing NABA's property without permission.

41.     On February 9, 2019, Wright encountered two CBP vehicles and one State Police truck blocking vehicular entry to the southern tract of NABA's land by parking on North Schuerbach Road at a bollard gate that serves as an access point regularly used by both Butterfly Center staff and visitors.  On information and belief, CBP was not patrolling for illegal immigration at the time and acted with intent to interfere with operations at the Butterfly Center.

11

42.     On December 4, 2019, Wright encountered two unmarked white pickup trucks on the southern portion of NABA's property with five men in plainclothes.  Wright confronted the men, who refused to explain what they were doing and gave conflicting answers regarding their affiliations.  They did not produce identification or credentials, despite being on private property, and fled.  Wright reported the suspicious persons to the Mission Police Department, which dispatched officers who chased the vehicles and later reported to Wright that the men were affiliated with CBP.

43.     On May 15, 2020, CBP Agent Ricardo Cantu told a visitor to the Butterfly Center that she could not cross the levee to explore the southern part of NABA's property because it was "not safe back there."  When subsequently questioned about this statement, Agent Cantu refused to provide any additional information or explain what the risk had been.  On information and belief, CBP was not engaged in patrolling the area for illegal immigration at the time.

44.     On May 17, 2020, a CBP helicopter hovered and circled around the Butterfly Center for about two-and-a-half hours, beginning around 8:00 am when the Butterfly Center opened to the public.  Later that day, members of the United States Army—at the direction of CBP—blocked the levee road at the cross-road leading to the southern portion of NABA's property.  When the Army personnel were asked to move and permit access, they refused to do so and gave no explanation for their conduct.  On information and belief, CBP was not engaged in patrolling the area for illegal immigration at the time.

45.     On May 18, 2020, CBP agents stationed themselves on the levee again, positioned so as to block access to the property south of the levee without giving any explanation for this

conduct.  On information and belief, CBP was not engaged in patrolling the area for illegal immigration at the time.

46.     This pattern of abusive behavior by CBP has also followed Butterfly Center staff outside of NABA's property.  In early June 2020, a CBP agent nearly ran Wright's car off the road while her son was driving.  A few days later, a CBP agent passed Wright in her car in a no-passing zone at high speed.  On July 24, 2020, CBP pulled over Wright for no apparent reason. CBP at all times knew that the license plate was Wright's and that she is employed at the Butterfly Center.  On information and belief, each of these incidents involved intentional harassment by CBP, and CBP was not patrolling for illegal immigration at the time.

47.     The occupation of the Butterfly Center, the blocking of Butterfly Center staff and visitors from accessing large portions of the property, and the frequent harassment of Butterfly Center staff and visitors by CBP and other law enforcement officers on NABA's property create logistical difficulties for the day-to-day operations of the Butterfly Center.  Staff must ascertain the identities of all unregistered visitors and are impeded in their ability to provide services to the Butterfly Center's regular visitors and to maintain their conservation efforts across all 100 acres of property.  CBP's consistent failure to take corrective action, provide any explanation or even respond to inquiries about these practices results from defendants either condoning them or lacking the functional supervisory control over agents in the field to control or account for their actions.

48.     Over the last three years, CBP agents have further violated NABA's rights by repeatedly and persistently leaving NABA's property open to potential trespassers and traffickers and by locking NABA out of the lower 70 acres of its land.  During this time,

13

Defendants never notified Butterfly Center staff that they needed to access NABA's land before or after cutting NABA's locks in the incidents described below.

49.     Between April 20 and 28, 2018, agents repeatedly affixed new locks to NABA's bollard gates near the levee, locking the Butterfly Center's staff and visitors out of the property. Wright reported this issue to Chief Padilla, who responded with words to the effect of "the Butterfly Center is the only property CBP has these problems with."

50.     On February 9, 2020, staff and guests were again prevented from visiting the 70 acres below the levee because CBP agents had replaced NABA's lock on the yellow bollard gate with their own.

51.     On April 14, 2020, CBP agents failed to lock the gate after themselves between NABA's property and the adjacent tract of land belonging to Mike Rhodes, leaving it open to trespassers.

52.     Wright determined that as of May 5, 2020 CBP had left the yellow bollard gate south of the levee unlocked for almost thirty days.

53.     On June 1, 2020, the yellow bollard gate south of the levee had again been left unlocked by CBP without explanation for approximately one week.

54.     This pattern repeated itself the following week when CBP again failed to affix its lock properly to the bollard gate south of the levee, leaving the Butterfly Center unsecured between June 7 and 10, 2020.

55.     Again on June 11, 2020 and once again on June 12, 2020, CBP failed to secure the bollard gate south of the levee after accessing it.

56.     On June 28, 2020, Butterfly Center staff arrived to find that they had been locked out of their own property by the manner in which CBP secured the chain and lock on the yellow

bollard gate south of the levee.  Staff had to remove CBP's lock with bolt cutters to regain access to the southern portion of NABA's property and to secure the gate again with their own lock.

57.     On August 12 and 13, 2020, Wright received calls from CBP requesting the code to NABA's lock on the yellow bollard gate south of the levee (because NABA had been forced to cut off CBP's lock a couple weeks earlier).  Their agents had entered NABA's property via another entrance to patrol and could not get out.  Wright directed them to exit via the gate through which they had entered.  On information and belief, Defendants' agents instead removed a security barrier from next to the yellow bollard gate and drove around it. Defendants' agents failed to replace the barrier after exiting the property, leaving NABA's property unsecured.  The wheels of their vehicles tore up the soil, leaving deep ruts beside the gate.  Butterfly Center staff then had to repair the damage and replace the barrier beside the gate.

58.     On August 21, 2020, CBP left its lock (which it had replaced after the August 13, 2020 incident) on the yellow bollard gate open and off, leaving the gate to the levee unsecured. This gate remained open through at least September 10, 2020.  Because of the barrel lock construction, the Butterfly Center staff could not secure the gate unilaterally and needed CBP to secure its lock to close the system.

59.     On November 18, 2020, CBP cut NABA's lock off the yellow bollard gate south of the levee, again leaving the Butterfly Center's land unsecured and open to trespassers.  CBP did not notify Butterfly Center staff that they needed to access the southern tract or that they had cut the Butterfly Center's lock.

60.     On December 28, 2020, CBP again locked NABA out of the lower 70 acres of its property when agents locked the yellow bollard gate south of the levee incorrectly.  To gain access, NABA staff were once again forced to cut CBP's lock.

61.     This pattern of interference with NABA's property rights continues to this day.  It persists despite NABA's repeated communications to CBP about the ongoing issues and despite NABA's installation of signs reminding Defendants to close and secure NABA's gates.  This practice is especially frequent at the yellow bollard gate immediately south of the levee, and it is especially disruptive there because that gate is the sole vehicular public-road access point from the Visitors' Pavilion to the lower 70 acres of the Butterfly Center's property.

62.     The cumulative effect of this conduct has severely impaired NABA's ability to carry out tasks essential to its day-to-day business operations and has diverted substantial staff time and attention away from their regular duties.  Each time CBP locks Butterfly Center staff out of the lower 70 acres, CBP impedes them from furthering the Butterfly Center's mission. Each time CBP leaves a gate open, it leaves NABA's property open to those who would wrongfully access the property along the southern border of the United States—including the very persons participating in illegal immigration that CBP is responsible for stopping.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW UNDER THE FIFTH AMENDMENT (PROCEDURAL DUE PROCESS)

63.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

64.     Defendants have, without prior notice and permission and without due process of law: (1) damaged NABA's locks and gates, removed NABA's locks from its gates and otherwise failed to secure NABA's gates and land; (2) damaged NABA's land and other

property; (3) invited others onto NABA's land; and (4) prohibited NABA staff and visitors from accessing the lower 70 acres of NABA's property.

65.     Prior to Defendants' deprivation of NABA's fundamental property rights, NABA was (and still is)  entitled to due process of law, which, at minimum, requires Defendants: (1) to adopt a formal procedure to ensure that Defendants' agents patrolling near NABA's land can open Defendants' own locks on NABA's gates; (2) to implement monthly training for agents patrolling on or near NABA's land on the proper methodology for effectively affixing locks to NABA's gates to ensure that NABA personnel can enter the property at any time; (3) to provide prompt notice when damage to NABA's property occurs in connection with Defendants' conduct; (4) to have meetings with NABA staff on a regular schedule concerning recent incidents of damage to NABA's property in connection with Defendants' conduct; (5) to provide reasonable advance notice to NABA and obtain its permission before inviting others onto or through NABA's land and to consult with NABA about reasonable alternatives for entry that do not interfere with NABA's operations; (6) to allow NABA and its guests access to all parts of the Butterfly Center except as immediately necessary for Defendants' conduct of an enforcement action; (7) to provide to NABA on a regular schedule reports of all recent enforcement actions and other occasions on which Defendants' agents and/or their invitees entered NABA's land; and (7) to adopt and implement any other policies and procedures deemed necessary and appropriate to remedy the violation of NABA's procedural due process rights.

66.     Defendants' conduct depriving NABA of its fundamental property rights is not authorized by any agreement, understanding, or license with NABA, nor is it pursuant to Defendants' patrol authority or otherwise permitted by law.

67.    Defendants' conduct extends beyond any reasonable understanding of their power to patrol as defined and limited by statute and regulation and as interpreted by case law.

68.    By reason of the foregoing, NABA is entitled to permanent injunctive relief against Defendants, restraining them from any further acts of the type that are the subject of this Claim for Relief without strictly complying with the procedures set forth herein, and a declaration that Defendants have violated the Fifth Amendment.

**SECOND CLAIM FOR RELIEF**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW UNDER THE**
**FIFTH AMENDMENT (SUBSTANTIVE DUE PROCESS)**

69.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

70.    Defendants have engaged in a pattern of intimidating, harassing and reckless conduct on NABA's property and against NABA personnel and guests by: (1) openly following, confronting, interrogating, and restraining the free movement of known NABA personnel and visitors on NABA's land; (2) repeatedly and deliberately misrepresenting that portions of the Butterfly Center are restricted, closed, inaccessible or unsafe; (3) disrupting NABA programming and preventing NABA staff from carrying out their normal business duties, including through the use of drones and helicopters; (4) asserting dominion and control over NABA's land, including through the prevention of NABA staff and guests from accessing NABA's land, inviting unauthorized third parties onto NABA's land, the deliberate destruction of NABA's property and continual refusal to secure NABA's gates and locks; and (5) endangering the physical safety—on and off NABA's land—of NABA personnel and their family members.

18

71.    Defendants' intimidating and harassing conduct is so gravely unfair and so egregious and outrageous that it shocks the contemporary conscience and reflects an arbitrary, unjustified, and cognizable level of executive abuse of power.

72.    Defendants' conduct is not authorized by any agreement, understanding, or license with NABA.

73.    Defendants' conduct extends beyond any reasonable understanding of its power to patrol as defined and limited by statute and regulation and as interpreted by case law, and is not otherwise permitted by law.

74.    By reason of the foregoing, NABA is entitled to permanent injunctive relief against Defendants, restraining them from any further acts interfering with NABA's rights and from harassing and intimidating NABA personnel and visitors, and a declaration that Defendants have violated the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, North American Butterfly Association, prays that this Court:

75.    Declare that Defendants have violated NABA's procedural due process rights under the Fifth Amendment to the United States Constitution by, without prior notice and permission and without due process of law, (1) damaging NABA's locks and gates, removing NABA's locks from its gates and otherwise failing to secure NABA's gates and land; (2) damaging NABA's land and other property; (3) inviting others onto NABA's land; and (4) prohibiting NABA staff and visitors from accessing the lower 70 acres of NABA's property.

76.    Enjoin Defendants (1) from damaging NABA's locks and gates, removing NABA's locks from its gates and otherwise failing to secure NABA's gates and land, and affirmatively to adopt a formal procedure to ensure that Defendants' agents patrolling near

NABA's land can open Defendants' own locks on NABA's gates and to implement monthly training for agents patrolling near NABA's land on the proper methodology for effectively affixing locks to NABA's gates to ensure that NABA personnel can enter the property at any time; (2)  affirmatively to provide notice within twenty-four hours and adequate compensation within sixty days when damage to NABA's property occurs in connection with Defendants' conduct and to have meetings with NABA staff on a regular schedule concerning recent incidents of damage to NABA's property in connection with Defendants' conduct; (3) from inviting others onto NABA's land except as authorized by law and as expressly permitted by NABA, and affirmatively to request permission at least one week in advance before inviting others onto or through NABA's land and to consult with NABA about reasonable alternatives for entry that do not interfere with NABA's operations; (4) from prohibiting NABA staff and visitors from accessing the lower 70 acres of NABA's property except as immediately necessary for Defendants' conduct of an enforcement action, and affirmatively to provide to NABA on a regular schedule reports of all recent enforcement actions and other occasions on which Defendants' agents and/or their invitees entered NABA's land; and (5) affirmatively to adopt and implement such other policies and procedures as may be necessary and appropriate to remedy the violation of NABA's procedural due process rights.

77.     Declare that Defendants have violated NABA's substantive due process rights under the Fifth Amendment to the United States Constitution by (1) openly following, confronting, interrogating, and restraining the free movement of known NABA personnel and visitors on NABA's land; (2) repeatedly and deliberately misrepresenting that portions of the Butterfly Center are restricted, closed, inaccessible or unsafe; (3) disrupting NABA programming and preventing NABA staff from carrying out their normal business duties,

including through the use of drones and helicopters; (4) asserting dominion and control over NABA's land, including through the prevention of NABA staff and guests from accessing NABA's land, inviting unauthorized third parties onto NABA's land, the deliberate destruction of NABA's property and continual refusal to secure NABA's gates and locks; and (5) endangering the physical safety—on and off NABA's land—of NABA personnel and their family members.

78.     Enjoin Defendants from (1) openly following, confronting, interrogating, and restraining the free movement of known NABA personnel and visitors on NABA's land; (2) repeatedly and deliberately misrepresenting that portions of the Butterfly Center are restricted, closed, inaccessible or unsafe; (3) disrupting NABA programming and preventing NABA staff from carrying out their normal business duties, including through the use of drones and helicopters; (4) asserting dominion and control over NABA's land, including through the prevention of NABA staff and guests from accessing NABA's land, inviting unauthorized third parties onto NABA's land, the deliberate destruction of NABA's property and continual refusal to secure NABA's gates and locks; and (5) endangering the physical safety—on and off NABA's land—of NABA personnel and their family members.

79.     Retain jurisdiction in this action to ensure compliance with the Court's Orders.

80.     Award Plaintiff its reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (2017) and/or other authority.

81.     Grant such other and further relief to Plaintiff as the Court may deem just and

proper.

Dated:   New York, New York
         February 25, 2021


                                        DEBEVOISE & PLIMPTON LLP

Of Counsel:                             By:  */s/Timothy K. Beeken*
                                        Timothy K. Beeken
Mark McLennan                           N.Y. Bar No. 2492650
Peter Urmston                           tkbeeken@debevoise.com)
                                        Emily Rebecca Hush (*pro hac vice
                                        pending*)
                                        Adrian St. Francis (*pro hac vice
                                        pending*)

                                        919 Third Avenue
                                        New York, NY  10022
                                        (212) 909-6000

                                        *Attorneys for Plaintiff*